**UNITED STATES BANKRUPTCY COURT**
**DISTRICT COURT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>NORVERGENCE, INC.<br><br>Debtor, | Chapter 7<br><br>Case No. 04-32079 (RG) |
| A Child's World Developmental Center and Ron Seidman; Active Wave, Inc. and Touraj Ghaffari; Aeronautical Systems Engineering and Faiek Zora; AKW Management , Inc. and David Abel; American Resource Management, Inc.; Apartment Rental Experts, Inc. and David Scott; Arbor International Inc. and Daniel Hudson; Audio Den, Ltd. and Roy Feldstein; Auto Trim Design of Suncoast, Inc. and William G. Davis; Barrington Partners, LLC and Scott Seger; Ben's Auto Repair and Benjamin & Rose M. Burke; Bruns Real Estate Services and Robert L. Bruns; Bull Run Electric Construction, Inc. and Kenneth M. Robinson; Business & Professional Services and Robert B Donald; C&S Electrical Contractor, Inc. and Carmen Varcadipane; Caston Plastering & Drywall; Cataract & Laser Center; Charles Schweiger; Cherry Valley Express, Inc. and Patricia Gronvold; Chief Safe & Lock Inc. and Darryl Hester; Clarkstown Equipment Co. Inc. and Joseph F. Lois, Jr.; Clearwater Casual Inc. and William Chamberlain; Continental Transit Coverage Inc. and Jim Donahue; Cornerstone Family Church of Richardson; Crockett Facilities Services, Inc. and Cynthia Crockett; Crossroad Capital Services, Inc. and Michael Borchetta; Customer Marble, Inc.; | Adversary No. 04-02967 (RG) |

Cutting Edge Installations, LLC :
and Richard L. Baumgardner III; :
Cutting Edge Laser Machining, :
Inc. and Douglas Nielsen; Dale :
Cannon dba Dale Cannon Agency; :
David C. Anton, Individual :
D/A/A Advanced Performance :
Tech; David G. Shaw, DC, PA and :
David Shaw; David Inc. and :
Ronald D. Ruegge; Delanco Board :
Of Education; Dennis R Fish and :
Dennis R. Fish; Drivestream, Inc. :
and Gopal Damodar; Dynamic :
Journey Inc. and Karen Layman; :
Electronic Data Management, Inc. :
and Gary E. Peterson; Epilepsy :
Association Of Central Florida and :
Charles F. Carmen; Eppinger :
Manufacturing Company and :
Jennifer L. Bustamante; Eveready :
Moving & Storage, Inc. and :
Elizabeth Skarbovig; Exit Realty :
and Michael Rotondoro; :
Fellowship Of Connected :
Churches And Ministries; First :
Security Mortgage Corp. and :
Stephen Perry; Foothill :
Engineering & Dewatering, Inc.; :
General Machine, Inc. and Joseph :
C. Kreher Jr.; Granite Memorials, :
Inc. and Robert Martiat; Greater :
Wheeling Area Youth Outreach, :
Inc.; Gregory C. Graham :
Individually and d/b/a A.C.T. :
Auto Body and Gregory C. :
Graham; G-WASA, Inc. (First :
Southwestern Title Co.); :
Hollywood Lamp & Shade Co. and :
Herbert J. Ramstein; HWA :
Landscape Architects and Harold :
Ross Wells; I360, Inc. and Heimir :
Eidskrem; IFC Credit Corp. and :
Larry Beaver; Indo-Us Sales, Inc.; :
Interm Health Care; Interstate :
Batteries and John Cyr; IW :
Consulting Engineers,Inc. and :
Christopher Andrew Walcker; J A :
M Plastics, Inc. and Joseph D. :
Mazzaferro; J.P. Anderer Assoc. :
Inc. and James Anderer; James R. :
Herdeman, LLC (Balanced Air :
Systems, Inc.) and James :
Herdeman; John L. Haver dba All- :
Lines Insurance Agency and John :

L. Haver; Johnson Granite Supply and Rolly Johnson III; JPaw, Inc. dba Unikote; K&D Diamonds, Inc. and Aaron Klein; Keystone Foam Corp.; King Displays Inc. and Wayne Sapper; Lange Eye Care & Associates, PA; Looking Glass Salon and Debra Ranger; LTM Paving, Inc. and William B. Fisher; M.L. McDonald Sales Company, Inc.; Main Event Caterers and Joel Thevoz; Major Mail, Inc.; Manning Search Group and Roger Manning; Mark Case dba Threads In Motion and Mark Case; Mathew Naftis DDS and Matthew Naftis; McCarty Insurance, Inc. and Kevin McCarty; Medical Billing Resources, Inc. and Stephen W. Elliott; Mike Treadway Architects, Inc. (MTA) and Lyman Michael Treadway and Melanie Ann Treadway each individually; Mobility Outfitters, Inc. and Steve Pierce; Mpr Travel, Inc and Shand Bathija; Multitech Group, Inc.; Nelson Pan Individually dba Nelson Pan, Dds and Nelson Pan; Netcom Electronics Services, Inc. and Francis Tran; New Horizon Child Development Center, Inc. and Cassandra Nelson; North Coast Salon Systems, Inc. and Amy L. Levak; Office Furniture Distributers and Mark Wood; Orange County Retina Medical Group and Mohit Nanda, MD; PhilcorGroup Inc. T/A PGI Systems dba Simply Laptops / Nerds On Demand and Jeffrey Greenmun; Photo Haven Of Pennington, Inc. and Christian Havens; Planet Aid; Preptech Of Florida, Inc. and Larry Watren; Pro Audio Dist. Inc.; Progressive Employment Concepts, Inc. and Rob Watilo; Proscience Analytical Services, Inc; Qualtest, Inc. and Fritz Depenthal; RGD & Associates, Inc. and Robert Davenport; Roberts Environmental Drilling, Inc.; Rosenblum's World Of Judaica, Inc. and Avrom Fox; Rotax Metals, Inc. and Peter S. :

Rosenthal; Scooters And More, LLC and Daniel Wade; Sev Staffing Inc. and Samuel Vallagomesa; Soccer Wholesale Warehouse, Inc. and Amjad Javaid; Spc Supply Inc. dba Amp Supply Company and Stephen Ciambrone; Sports Center USA and Josehp Lococo; St. Benedict The Abbot Church; State Farm Insurance and Jeremy Normand; Success Business Services and Michael K. Mathews; Supplement Synergy, Inc. and Joseph N Savas; Tasty Baking Company; Texas Gyro and Kelley Van Haitsma; The Auto Club, Inc. and David Satzman; The Cognitive Therapy Institute, Inc. and James L. Shenk; Thomas Insurance & Real Estate and Jay Thomas; Thomas Miller Alternative Finance, Inc. and Thomas Miller; Thomas R. Riggs dba Compusolutions and Thomas R Riggs; Thompson's Gas Inc. and Phillip Thompson; Tower Motel; Tri State Pumps, Inc. and Michael Caringi; U.S. Automatic Management, L.L.C. and Michael Storms; Urgent Care Medical Center and Hin A.K. Patel; Vantage Metals Co. Inc.; Victor Flaherty; Warren's Interior Design & Furniture, Inc. and Patricia B. Warren; Wayne Hintze and Wayne H. Hintze; Wesley H. Smith Landscape Contractors, Inc. and Wesley Smith; WG Food Distributors and Himat Gulajan; Whole House Cabinetry, Inc. and Pamela S. Monaco; Wilkerson Packaging Co., Inc.; Woodland Fashion Optical Inc. and Leo Khomutov; ABC Corp.'s 1-100 and John and Jane Doe's 1-100.

Plaintiffs

v.

Norvergence, Inc., and IFC Credit

Corp. :
:
Defendants. :

---

**AMENDED ADVERSARY COMPLAINT**

Plaintiffs, by and through their undersigned counsel, file the instant complaint seeking a declaratory judgment pursuant to 28 U.S.C. 2201, et seq. and Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7001(9), as to each of their respective and various rights and obligations under and pursuant to certain equipment rental agreements ("ERAs"), seeking relief and damages under and pursuant to, *inter alia*, N.J.S.A. 56:8-1 et seq., N.J.S.A. 2A:32-1, and 18 U.S.C.A. §§1961, et seq., based upon Defendant's violations thereof arising out of its conduct in relation to Norvergence, Inc. and those ERAs, seeking equitable subordination or disallowance of any and all claims filed or asserted by the Defendant in the Norvergence, Inc. Chapter 7 bankruptcy case ("Norvergence Case") pursuant to 11 U.S.C. §§502(b) and 510(c) and asserting the Plaintiffs' unsecured claims for damages caused by Norvergence in concert with the Defendant arising out of the ERA's pursuant to 11 U.S.C. §§501 & 502, and in support thereof say as follows:

**I. PARTIES**

1. Certain of the Plaintiffs, whose names and addresses are listed on Exhibit "A" hereto, are non-profit entities, charitable associations, governmental bodies and small businesses located throughout the continental United States, which maintain places of business at the locations listed on Exhibit "A" (referred to herein as the "Plaintiff Businesses").

2. In addition, certain of the Plaintiffs, also listed on Exhibit "A" are adult individuals, who maintain places of business and/or residences throughout the continental United States as indicated on Exhibit "A," and who are owners, in whole or in part, of certain of the Plaintiff Businesses. Each of these individuals allegedly

executed a personal guarantee associated with the ERAs discussed below. These individuals are referred to herein as "Plaintiff Guarantors." Plaintiff Businesses and Plaintiff Guarantors are referred to herein collectively as "Plaintiffs."

3. Defendant, Norvergence, Inc., debtor in the Norvergence Case, ("Norvergence") is a New Jersey corporation, incorporated in 2001, which maintained a place of business at 550 Broad St, Newark, NJ.

4. Defendant IFC Credit Corp. (hereinafter referred to as the "Defendant") is a business organization, which maintains a place of business at 8700 Waukegan Road, Suite 100, Morton Grove, IL 60053.

5. The Defendant purports to be the assignee of certain ERAs, each of which was entered into by and between Norvergence and one of the various Plaintiff Businesses. Certain of these ERAs, but not all, allegedly contain the personal guarantees of the Plaintiff Guarantors.

## II. JURISDICTION, VENUE AND CHOICE OF LAW

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§157, 1331 and 1334.

7. Venue is appropriate in this Court pursuant to 28 U.S.C. §1409 and 18 U.S.C. §1964.

8. This is a core proceeding under 28 U.S.C. §157(b)(2)(A), (B) & (O). In the alternative, this proceeding arises in or is related to a case arising under Title 11 of the Bankruptcy Code pursuant to 28 U.S.C. §157(a).

9. The applicable statutory basis for the causes asserted herein, include but are not limited to 11 U.S.C. §§105, 502, and 510, 18 U.S.C. §§1961, et seq., N.J.S.A. 56:8-1 et seq. and N.J.S.A. 2A:32-1.

10. New Jersey law governs the construction and enforcement of the ERA's. The ERAs (a sample is attached hereto as Exhibit "B"), with Norvergence identified as the "Rentor," contain the following provision:

> This Agreement shall be governed by, construed and enforced in accordance with the Laws of the state in which Rentor's principal offices are located, or if this Lease is assigned by Rentor, the State in which the assignee's principal offices are located, without regard to such State's choice of law considerations and all legal actions relating to this Lease shall be venued exclusively in a state or federal court located within that State, such court to be chosen at Rentor or Rentor's assignee's sole option.

11. The ERA provides that in the event a guarantee is executed, the choice of law and venue provisions governing the guarantees follow the same scheme.

12. The ERA defines and identifies the "Rentor" as Norvergence, which maintained its principal place of business at 550 Broad Street, Newark, Essex County, New Jersey.

13. The ERA defines and identifies the "Renter" to be one of the various Plaintiffs herein.

14. The ERA provides neither the identity nor address of any "Assignee."

15. The ERA was formed under New Jersey Law, and New Jersey is the only certain and appropriate source of law for governing, enforcing, and construing the ERA.

16. The ERAs were contemporaneously entered into with the telecommunication service agreements between Norvergence and the Plaintiff Businesses. The general terms and conditions thereof are attached hereto as Exhibit "D". Exhibit "D" provides, at paragraph 12, that New Jersey law governs the construction and interpretation of the agreement. As described in detail below the telecommunication services agreement and the ERA were a bundled, integrated offering, which was an integral part of the fraudulent scheme, similar to a "Ponzi" scheme, perpetrated by Norvergence, from the inception of its business operations.

17. Given the volume of cases and the need for consistent resolution of the issues involved, the potential for inconsistent results if the claims are the subject of

individual suits, and the administration of the Norvergence Case, equity and judicial economy mandate that all the claims be presented to a single court, and this Court is the only appropriate court for that purpose.

## III. THE PONZI SCHEME

### A. NORVERGENCE, INC.

18. Norvergence held itself out as a provider of "low-cost" telecommunication services to small and medium size businesses throughout the United States. See copy of Norvergence web site, Exhibit "F."

19. Norvergence purported to offer deeply discounted telecommunication services to prospective business customers, but required that its prospective customers also enter into ERAs in order to avail themselves of those services. See Exhibit "G."

20. Each of the Plaintiff Businesses herein entered into an agreement with Norvergence for the provision of telecommunication services for the Plaintiff Businesses, and each of the Plaintiff Businesses also simultaneously entered into an ERA with Norvergence for what was purported to be a "rental" of certain hardware and software which the ERA referred to as a "MATRIX™" device.

21. Norvergence represented that it charged its customer a flat monthly fee for *unlimited* long distance, *unlimited* internet, and *unlimited* cellular calling, and provided each customer with an *unlimited* number of cell phones. See Exhibit "F."

22. Prior to being permitted to obtain the services and discounts promised by Norvergence, Norvergence required Plaintiffs to make application to Norvergence and to submit their existing telecommunications bills to Norvergence. See Exhibit "H."

23. Norvergence used the telecommunications bills provided by the Plaintiffs to propose to each of the respective Plaintiff Businesses the cost for Norvergence's flat rate service and to calculate the monthly fee for the ERA, as set forth more fully below. See Exhibit "I."

24. Norvergence, through its advertising, marketing and form letters sent to each prospective customer, engaged in high pressure, misleading, and deceptive sales tactics that resulted in significant confusion and misunderstanding by each of the Plaintiff Businesses, with respect to the nature of the services actually purchased from Norvergence and the distinction between the Norvergence agreement for telecommunication services and the ERA. See Exhibits "F", "G", "I" and "J."

25. Norvergence represented that only the most qualified applicants would be accepted as Norvergence customers because of the extremely high demand for the Norvergence system. See Exhibit "J."

26. Norvergence refused to negotiate any of the terms of either the ERA or the Norvergence telecommunication services agreement.

27. Norvergence represented that it was able to offer such deeply discounted telecommunication services because of the engineering technology associated with the Matrix Devices. See Exhibit "J."

28. Norvergence represented that the engineering "advances" associated with the Matrix Devices allowed for "free unlimited calling circuitry" and the "voice as fast as data" solution, which *permitted* the elimination of per-minute telecommunication charges. See Exhibits "J" and "K".

29. Norvergence entered into an agreement with Qwest Communications Corporation to utilize Qwest's network for routing Norvergence customer's telephone and data traffic. Upon information and belief, Qwest billed Norvergence for telecommunication services on a flat rate basis. See Qwest's Application in Support of its Emergency Motion, Exhibit "L" hereto.

30. Norvergence entered into agreements with Sprint Communications Company, L.P. and T-Mobile USA, Inc. for the provision of cellular telephone service to Norvergence customers. These cellular providers billed Norvergence on a per

minute basis. See Sprint and T-Mobile Applications in Support of Emergency Motions, Exhibits "M" and "N" hereto.

31. Norvergence's sales and marketing efforts increased dramatically in late 2003 and continued through June 2004. See Dunn & Bradstreet report, Exhibit "O" hereto.

32. As a result of Norvergence's sales and marketing efforts, ever-increasing numbers of businesses were induced to sign the telecommunication services agreements and the ERAs, which resulted in increased demand for service upon the telecommunication vendors, Qwest, Sprint, and T-Mobile. See Exhibit "L" at paragraph 13; Ruth West Certification attached to Exhibit "M."

33. While the Norvergence scheme to induce the Plaintiffs to sign telecommunication service agreements and ERAs grew, not only did Norvergence's anticipated revenue increase, but the demand for the use of telecommunication services expanded exponentially.

34. As Norvergence continued to acquire new customers the cost associated with the demand for the use of telecommunication services grew but the massive amounts of cash being generated by the sales of ERAs disappeared.

35. Ultimately, Norvergence enrolled approximately 10,000 non-profit, charitable, governmental and small business customers, of which approximately 8000 were Matrix 850 "customers," and approximately 2000 were Matrix Soho "customers."

36. On June 30, 2004, an involuntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") was filed against Norvergence in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"). At a hearing on July 14, 2004, Norvergence voluntarily converted the Norvergence Case to a Chapter 7 liquidation, and a Trustee was appointed.

**B. THE MATRIX DEVICE**

37. Norvergence utilized two (2) different types of Matrix Devices referred to respectively as the *Matrix 850* and the *Matrix Soho* (jointly herein the "Matrix Devices").

38. The Matrix 850 simply served as an interface between a customer's telephone and computer system and a telecommunications service provider's T-1 line. This type of device is quite commonly used throughout the telecommunication industry and is referred to as an integrated access device, or IAD. See Telecommunications Industry White Paper, Exhibit "P."

39. Norvergence purchased the Matrix 850 devices for approximately $1,500.00 per unit from the manufacturer of the device.

40. The Matrix Soho is in actuality a "firewall" device that was connected between a customer's computer and a modem connected to a DSL internet line in the customers' building. The Matrix Soho device is not physically connected in any way whatsoever with the customer's telephone system or service. Norvergence simply directed the local telephone system providers to internally re-route long distance calls of customers with a Matrix Soho device through Qwest's network. The Matrix Soho was used for smaller customers.

41. Norvergence purchased the Matrix Soho devices for approximately $345.00 per unit from the manufacturer of the device.

42. The manufacturer of the Matrix Devices is Adtran, Inc., a Delaware corporation with a principal place of business in Huntsville, Alabama. Attached hereto and incorporated herein as Exhibit "Q" is the purchase agreement dated February 1, 2003, as amended, by and between Norvergence, and Adtran, Inc. This agreement provides that Norvergence may only sell the Adtran products as part of a bundled service offering, and not as a stand alone product offering.

43. Norvergence required that the Plaintiffs enter into the ERA for sixty (60) month terms.

44. The aggregate of the sixty (60) monthly payments as provided in the ERAs for the Matrix 850 device ranged from approximately **$20,000.00 to as much as $180,000.00** per Matrix device, even though the cost of the Matrix 850 was only $1500.00 per device.

45. The aggregate of the sixty (60) monthly payments as provided in the ERAs for the Matrix Soho ranged approximately from **$12,000.00 to $30,000.00** per Matrix device, even though the cost of the Matrix Soho was only $345 per device.

46. The wide range in monthly charges for the Matrix Devices generally corresponds to the difference between the historical cost of telecommunication services to the respective Plaintiffs as revealed in the telecommunication bills it submitted as part of the Norvergence application process (See Exhibit "H"), and the flat fee actually charged by Norvergence for the "free unlimited" telecommunication services.

47. In reality, there is no technological relationship whatsoever between Norvergence's offer of "free unlimited" telecommunication services and the Matrix Devices.

48. The Matrix Devices were generally not installed in a manner so as to serve the function with respect to telephone service in the manner represented by Norvergence.

49. To the contrary, to the extent that the Matrix Devices served any function whatsoever, they merely served as a common integrated access device for the Plaintiffs' internet and telephone service.

50. Norvergence frequently failed to deliver services as promised to the Plaintiffs.

51. Many of the Plaintiffs never received any service whatsoever in connection with their Norvergence service agreement.

52. In many instances, the equipment associated with the Norvergence system, including the Matrix Devices, was never installed, or to the extent that it was installed, it was never made fully operational.

53. Many of the Plaintiff Businesses suffered from repeated interruptions of their telecommunications services.

54. These service problems were frequently reported to Norvergence through complaints registered by dissatisfied Norvergence customers, including certain of the Plaintiffs.

**C. THE ERA DRIVES THE PONZI SCHEME**

55. Norvergence required that all of its customers enter into the ERA as an integral part of every sale of Norvergence's telecommunication services. The ERA was a part of the package of documents thrust at the Plaintiffs to execute in order to obtain the "reduced rate telecommunication services."

56. The ERA purports to be an agreement for the rental of a certain Matrix Device, for a term of sixty (60) months. In reality, the ERA is nothing more than a mechanism whereby Norvergence fraudulently captured advance payments for telecommunication services that it never intended to provide.

57. The ERAs were entered into by and between Norvergence, as the "Rentor," and the customers, including the Plaintiffs, as the "Renter."

58. The ERA was bundled and integrated with the provision of service by Norvergence.

59. A default under the ERA was also a default under the service agreement, but a default by Norvergence under the service agreements was not a default under the ERA.

60. Many, but not all of the executed ERAs also allegedly contain a personal guaranty, executed by the Plaintiff Guarantors, who are owners and/or principals of the business entity identified as the Renter.

61. The ERA is a two sided form, with the terms and conditions printed on the reverse side in extremely small print.

62. The ERA provides that the "Rentor" (Norvergence, in the vast majority of cases), is the owner of and has title to the Matrix device.

63. The ERA provides that Norvergence may sell, assign or transfer all or part of the ERA and/or the equipment without notifying the Renter, in which case the new owner will have all of Norvergence's rights, but none of its obligations.

64. The ERA provides that the Rentor and the Renter agree that if Article 2A of the UCC is deemed to apply to the ERA, then the ERA is to be considered a finance lease thereunder, and the Renter waives all rights and remedies provided under Article 2A.

65. The ERA further provides that:

> You agree to keep the Equipment insured against all risks of loss in an amount at least equal to the replacement cost until this Rental is paid in full.

66. The Defendant required certain of the Plaintiffs to pay for insurance each month based not on the replacement value of the Matrix Device but on the total amount of the monthly payments to be made over the term of the ERA.

67. The ERA further provides –

> If (a) a default occurs, … you will immediately return the Equipment to any location(s) and aboard any carrier(s) we may designate in the continental United States… You will continue to pay Rental Payments until the Equipment is received and accepted by us.

68. Shortly after the Bankruptcy Court granted the telecommunications service providers' (Qwest, Sprint and T-Mobile) applications to terminate service on July 14, 2004, all telecommunication services ceased and Norvergence was thereafter in default of the telecommunication services agreements.

## D. DEFENDANT'S PARTICIPATION

69. At various times throughout the course of Norvergence's fraudulent scheme, a number of leasing and finance companies, including the Defendant herein, entered into agreements with Norvergence. These agreements provided for the sale and/or assignment of all of Norvergence's right, title, and interest in the ERAs entered into by and between Norvergence and the customers of Norvergence, including the Plaintiff Businesses and the Plaintiff Guarantors, to the Defendant. See, e.g. Draft of Master Program Agreement, Exhibit "R."

70. Upon information and belief, these agreements between Norvergence and the Defendant provided for the Defendant's review of applications submitted by certain prospective customers of Norvergence, including the Plaintiffs

71. The Defendant participated with and cooperated with Norvergence in the review and underwriting of prospective customers' applications, including the Plaintiffs.

72. Upon information and belief, the Defendant, in whole or in part, established standards for acceptance of prospective customers' applications, in concert and in cooperation with Norvergence.

73. Upon information and belief, the Defendant eliminated or curtailed its own established credit analysis and underwriting procedures so as to allow the Defendant to enter into this cooperative relationship with Norvergence. (See Exhibit "S.")

74. The Defendant holds itself out as having expertise in the field of telecommunication equipment leasing or equipment leasing in general. Contrary to the standard practice of the trade, however, the Defendant purchased the ERAs and the Matrix Device(s) it covered without any regard whatsoever for the actual or replacement value of the Matrix Device(s) which were being purchased.

75. The Defendant worked in close cooperation with Norvergence to maximize profits for the Defendant and for Norvergence at the unfair expense of the Plaintiffs.

76. As a result of the Defendant's actions, taken in concert with Norvergence, many of the ERAs were assigned to and/or purchased by the Defendant from Norvergence simultaneously, or very nearly thereto, with the acceptance of the ERAs by Norvergence.

77. Many ERA's were actually accepted on behalf of Norvergence by the Defendant's representatives.

78. Many ERA's were assigned to the Defendant before or at the time they were accepted by Norvergence.

79. In addition, certain of the leasing companies extended direct loans to Norvergence in exchange for a collateral assignment of ERAs held and administered by Norvergence. See, e.g. IFC Credit Corporation Application for Relief from Automatic Stay, Exhibit "V."

80. Pursuant to the various agreements between Norvergence and the Defendant, the Defendant purchased and/or took an assignment of all of Norvergence's right, title, and interest in and to the associated ERAs and the Matrix Devices associated with each such ERA.

81. The Defendant, in consideration for the assignment or purchase aforesaid, purportedly paid to Norvergence approximately 60% of the value of the aggregate payment stream associated with each ERA ("Discounted Payment"). Thus, for example, in the event that a particular ERA was to provide for the payment by the customer of $100,000.00 over the 60 month term of the ERA, then the Defendant would pay $60,000.00 to Norvergence as a Discounted Payment.

82. At a time when the published Prime Rate charged by banks on loans to commercial customers hovered at or near 4% per annum, the Defendant would be

earning almost 20% per annum on the ERAs, notwithstanding the fact that only the customers with the best credit were eligible to rent the Matrix Devices and to obtain the Norvergence telecommunication services.

83. The Defendant would then commence administration and collection of payments under the ERA directly from the Norvergence customers, including the Plaintiffs, who invariably were located in states far from where the Defendant does business.

84. The existence of the Defendant and its participation in this scheme was not revealed to the Plaintiffs until *after* the ERAs were accepted by the Plaintiff Businesses and then subsequently sold and/or assigned to the Defendant. In many instances, the Plaintiffs were first advised as to the existence of an assignee following commencement of the Norvergence Case.

85. The Defendant's payment of the Discounted Payment to Norvergence in this fashion enabled and permitted Norvergence to continue to carry out its fraudulent scheme and to further its misrepresentations to additional prospective customers.

86. In the vast majority of these transactions, Norvergence sold or assigned the ERAs to the Defendant which does business in a state far distant from the Plaintiffs, despite the availability of other finance companies whose principal places of business are in close proximity to the Plaintiffs.

87. Because of this scheme, Plaintiff Businesses and Plaintiff Guarantors are faced with the threat or actuality of suit brought by the Defendant in a remote forum, and given the potential for litigation causing the Plaintiffs to incur substantial expenses and inconvenience in defending against the Defendant's attempts to enforce and collect on the fraudulently originated and unlawful ERA's, which amounts to depriving these Plaintiffs of a meaningful day in Court to defend themselves.

**E. THE SCHEME COMES TO AN END**

88. Norvergence was selling its telecommunication services at a loss. In fact, since it incurred a loss with each transaction, as with any Ponzi Scheme, it used some of the cash it acquired from the prior sale of ERAs to the Defendant and the other finance companies to fund its ever-growing costs of providing telecommunication services through Qwest, Sprint, T-Mobile, and others, and to further the scheme.

89. Ultimately, Norvergence was apparently unable to sell enough ERAs to the Defendant and the other finance companies as was necessary to meet the ever increasing demands for payment from Qwest, T-Mobile, and Sprint, for the telecommunications charges these vendors were assessing against Norvergence.

90. Charges from these three (3) vendors combined are alleged to approximate $2,000,000.00 per week by July 2004. While the scheme continued to generate large sums of cash, Norvergence stopped paying its employees (whose payroll checks bounced and whose benefits plans went unfunded), and its other trade creditors.

91. As a result, for an extended period which ended on June 30, 2004, when an involuntary petition under Chapter 11 of the Bankruptcy Code was filed against Norvergence, Norvergence continued to sell its services and assign the ERA's in order to obtain cash from the Defendant and/or other finance companies who continued to purchase the ERAs, but did not pay its bills. That cash has "disappeared."

92. At a hearing held on July 14, 2004, the Bankruptcy Court entered an order converting the Norvergence Case from an involuntary Chapter 11 proceeding to a voluntary Chapter 7 liquidation. A trustee was appointed that day. See Exhibit "W."

93. At the same time, the Bankruptcy Court entered an order authorizing Qwest Communications to terminate its T1 service to Norvergence's approximately 10,000 customers. See Exhibit "X."

94. At the same time, the Bankruptcy Court entered an order authorizing Sprint and T-Mobile to terminate cellular telephone service to Norvergence's approximately 10,000 customers. See Exhibits "Y" and "Z."

95. Norvergence effectively ceased all operations at or about that time.

96. Plaintiff Businesses effectively ceased to receive any services from Norvergence at or about that time.

97. Plaintiff Businesses effectively ceased to receive the benefit of their contracts with Norvergence at or about that time.

98. Unfortunately, many of the Plaintiff Businesses made initial and, thereafter, monthly payments to Norvergence and/or the Defendant on the ERA's not realizing that they had been the victim of a fraud.

99. Qwest terminated its T1 service to all Norvergence customers within days of the Bankruptcy Court's conversion order, thereby disconnecting all long distance telephone and internet service to Norvergence's customers, Plaintiffs herein.

100. Plaintiffs were forced to try to obtain alternate sources for their telecommunication services at substantial cost and expense all of which are claims against the Norvergence Estate.

101. Since Norvergence ceased operations, the Matrix Devices were of no use whatsoever to the vast majority of Norvergence customers, including Plaintiffs, because the vast majority of telecommunication carriers require the use of their own equipment, and in any event, no substitute carriers were offering any "comparable" services utilizing the Matrix Devices.

102. Since Norvergence ceased operations, many of the Plaintiffs stopped or desired to stop making payments under the ERAs to the Defendant, which would reduce Plaintiffs' claims against the Norvergence Estate.

103. Because of the accelerated enrollment of customers immediately preceding the filing of the involuntary petition against Norvergence, a large number of

the Plaintiffs merely took delivery of the Matrix Devices, and no installation or service activation took place prior to the end of Norvergence's operations.

104. It is clear that Norvergence was engaged in a fraudulent scheme in concert with the Defendant to generate cash by means of converting its promise to provide reduced rate telecommunication services into Discounted Payments from the Defendant for the long term rental of a Matrix Device pursuant to the ERAs, and that Norvergence never intended to nor could it provide the promised telecommunication services.

105. As a result, *every* Norvergence service agreement and *every* ERA was fraudulently entered into by Norvergence, which was, at all times intent upon operating its Ponzi scheme, and that fraud permeates every telecommunications service agreement, which incorporates each ERA, from inception forward.

106. The Defendant continued to purchase the rapidly increasing volume of ERAs in order to obtain the very high rates of return generated by the steep discount at which the ERAs were sold by Norvergence, notwithstanding the increased frequency of customer complaints it was receiving from the Plaintiffs and other defrauded Norvergence customers that the Matrix Devices were not being installed and that the promised telecommunication services were not being provided.

107. Nevertheless, many former customers of Norvergence have been sued and/or threatened with suit by the Defendant and other finance companies for the full amounts claimed to be due under the ERAs, without regard to the fraudulent origins of the ERA's and the total lack of telecommunication services from Norvergence.

108. Unfortunately, in the face of threatening letters from the Defendant and the threat or actual commencement of litigation by the Defendant and/or other financing companies, some of the Plaintiffs have continued to make payments to the Defendant.

## COUNT I

## Declaratory Judgment

109. Plaintiffs incorporate by reference the preceding paragraphs as if same were set forth at length herein.

110. The ERA does not, in actuality, document or evidence the rental or lease of the Matrix Device.

111. There is no connection whatsoever between the actual cost of the Matrix Device and the charge reflected in the ERAs.

112. In fact, the total amounts required to be paid under the ERAs frequently *exceed* one hundred (100) times the price of the associated Matrix Device.

113. The ERA actually serves as a mechanism whereby Norvergence fraudulently induced the Plaintiffs to finance the cost of their telecommunication services that Norvergence had no present intention of providing, and does not evidence a bona fide rental, lease or sale of equipment.

114. The ERA does not evidence a bona fide lease or rental of equipment, but rather, evidences a contract on prepaid telecommunication services entered by Norvergence for the express purpose of obtaining Discounted Payments from their sale to Defendant.

115. The Defendant holds itself out as a lessor or financier of equipment lease transactions in the normal course of business.

116. The Defendant knew or should have known that the "leased" Matrix Device was the subject of the "lease" evidenced by each and every ERA had a value wholly unrelated to and substantially less than the value of the stream of rental payments required to be paid by the Plaintiff Businesses under the ERA.

117. The Defendant relied upon the unfair, unconscionable and unenforceable venue provision in the ERA as well as the appearance that the ERA was a valid and enforceable Article 2A finance lease, which permits it to bring or threaten to bring a collection suit in far distant jurisdictions, when it purchased the ERAs, so as to unfairly, improperly and economically foreclose the ability of the Plaintiffs to mount valid defenses to such collection suits.

118. As Norvergence knew at the time it entered into each transaction that it could not and, in fact, had no present intention of fulfilling the terms of the telecommunication service agreement and related ERAs, Norvergence was engaged in actual fraud when it entered into each and every transaction.

119. The Defendant fueled Norvergence's Ponzi scheme with the Discounted Payments, and aided, abetted, and enabled Norvergence in the commission of this fraud, through its purchase of what purports to be the equivalent of UCC Article 2A finance leases that it knew contained unfair, unconscionable and deceptive provisions, so as to cut off the otherwise valid claims and defenses of the Plaintiffs.

120. The Defendant was the means and instrumentality of Norvergence to perpetrate its fraud on the Plaintiffs.

**WHEREFORE**, Plaintiffs respectfully request that the Court:

a. enter judgment in their favor on this Count;

b. declare the ERAs together with the associated guarantees of the Plaintiff Guarantors to be void from inception and rescinded;

c. award to Plaintiffs and against the Defendant damages plus interest from

the date of the first payment to the Defendant made pursuant to each ERA;

d. award to Plaintiffs and against the Defendant the costs of prosecuting this action, including counsel fees, from the Defendant;

e. award to Plaintiffs and against the Defendant the costs of defending any action brought to enforce the ERA, including counsel fees from Defendant ; and

f. award Plaintiffs punitive damages as against the Defendant; and

g. award to Plaintiffs and against the Defendant such other equitable relief as deemed appropriate by the Court.

**COUNT II**

**Declaratory Judgment – New Jersey Uniform Commercial Code**

121. Plaintiffs incorporate by reference the preceding paragraphs as if same were set forth at length herein.

122. The provision of the Matrix Device by Norvergence to the Plaintiff Businesses does not qualify as a "lease" under New Jersey's enactment of the Uniform Commercial Code.

123. The provision of the Matrix Device by Norvergence to the Plaintiff Businesses does not qualify as a "finance lease" under New Jersey's enactment of the Uniform Commercial Code.

124. The entire ERA is unconscionable under New Jersey's enactment of the Uniform Commercial Code.

125. The ERA is void because it is a contract of adhesion that unconscionably divorces the duty to provide telecommunication services from the obligation to pay for the ERA.

126. The Defendant is not a holder in due course, and is subject to all claims and defenses that Plaintiffs might have had as against Norvergence.

127. The ERA is otherwise void because it is usurious.

128. The ERA is otherwise void because it violates the several provisions of the Uniform Commercial Code.

**WHEREFORE**, Plaintiffs respectfully request that the Court:

a. enter judgment in their favor on this Count;

b. declare the ERAs together with the associated guarantees of the Plaintiff Guarantors to be void from inception and rescinded;

c. award to Plaintiffs and against the Defendant damages plus interest from the date of the first payment made pursuant to each ERA;

d. award to Plaintiffs and against the Defendant the costs of prosecuting this action, including counsel fees;

e. award to Plaintiffs and against the Defendant the costs of defending any action brought to enforce the ERA, including counsel fees;

f. award Plaintiffs punitive damages as against the Defendant; and

g. award to Plaintiffs and against the Defendant such other equitable relief as deemed appropriate by the Court.

**COUNT III**

**Conversion**

129. Plaintiffs incorporate by reference the preceding paragraphs as if same were set forth at length herein.

130. Because the Defendant knew or should have known about, participated in and was the means and instrumentality for the commission of the Ponzi scheme as detailed above and have not provided Plaintiffs with the services or technology as represented and contracted for, and Plaintiffs have paid and continue to pay for such technology, Defendant is unlawfully

in possession of property to which Plaintiffs have legal and possessory rights.

131. The Defendant has unlawfully taken money due and owing Plaintiffs and converted such money for its own use.

132. The Defendant, intentionally and without lawful justification, continues to interfere with Plaintiffs' right of possession in their funds.

133. The Defendant's actions in depriving Plaintiffs' right of ownership in the funds and possessing and retaining said funds without Plaintiffs' consent have caused damages to Plaintiffs.

**WHEREFORE**, Plaintiffs respectfully request that the Court:

a. enter judgment in their favor on this Count;

b. award to Plaintiffs and against the Defendant damages plus interest from the date of the first payment made on each ERA ;

c. award to Plaintiffs and against the Defendant the costs of prosecuting this action, including counsel fees;

d. award to Plaintiffs and against the Defendant the costs of defending any action brought to enforce the ERA, including counsel fees; and

e. award Plaintiffs punitive damages as against the Defendant; and

f. award to Plaintiffs and against the Defendant such other equitable relief as deemed appropriate by the Court.

**COUNT IV**

**<u>Violations of New Jersey Consumer Fraud Act</u>**

134. Plaintiffs incorporate by reference the preceding paragraphs as if same were set forth at length herein.

135. The Defendants' conduct as set forth above, including without limitation, the Defendant's continued demand for and/or collection of monthly payments when the Defendant knew or should have known that they were participating in and were the means and instrumentality for the commission of the scheme to represent that services and technology would be provided to Plaintiffs even though there was never any intention to provide such services and technology over the term of the ERAs, which is in violation of the New Jersey Consumer Fraud Law, because this scheme:

a. is an unconscionable consumer practice pursuant to N.J.S. 56:8-2;

b. is deceptive pursuant to N.J.S. 56:8-2;

c. is fraudulent pursuant to N.J.S. 56:8-2;

d. is a false pretense pursuant to N.J.S. 56:8-2;

e. constitutes a false promise pursuant to N.J.S. 56:8-2;

f. is a misrepresentation pursuant to N.J.S. 56:8-2; and

g. is a knowing concealment, suppression, or omission of material fact with the intent that Plaintiffs rely on such concealment, suppression, or omission pursuant to N.J.S. 56:8-2.

**WHEREFORE,** Plaintiffs respectfully request that the Court:

a. enter judgment in their favor on this Count;

b. award Plaintiffs treble damages as against the Defendant;

c. award to Plaintiffs and against the Defendant attorneys' fees, filing fees and the costs of prosecuting this action; and

d. award to Plaintiffs and against the Defendant the costs of defending any action

brought to enforce the ERA, including counsel fees; and

e. award to Plaintiffs and against the Defendant such other equitable relief as deemed appropriate by the Court.

**COUNT V**

**RICO: 18 U.S.C.A. 1961, *et seq.***

136. Plaintiffs incorporate by reference the preceding paragraphs as if same were set forth at length herein.

137. At all relevant times, each of the Plaintiffs, Norvergence, and the Defendant was a "person" within the meaning of 18 U.S.C.A. 1961(3) and 1962(c).

138. At all relevant times, Norvergence and the Defendant acted together and in concert, thereby constituting a group of persons associated together in fact within the meaning of 18 U.S.C.A. 1961(3) and 1962(c) for the common purpose of carrying out the unlawful and manipulative scheme described above.

139. The association-in-fact and the conspiracy functioned as a continuing unit in carrying out this unlawful scheme.

140. The association-in-fact between Norvergence and the Defendant ("Enterprise") constitutes an "enterprise" within the meaning of 18 U.S.C.A. 1961(4).

141. The Enterprise functioned as a continuing unit, commencing at the time Norvergence first assigned any of the ERAs , and continuing through the last assignment of any ERA to the Defendant. By its nature, the wrongful conduct of the Enterprise is open-ended and will continue through the final ERA payment absent this litigation.

142. Norvergence and the Defendant each gave substantial assistance to the

Enterprise as a whole and to the unlawful activities and scheme through which its affairs were conducted.

143. In particular, Norvergence's and the Defendant's involvement in the scheme and RICO violations are set forth in detail above, and the following conduct is typical of the types of activity undertaken:

a. Norvergence promoted the use of the Matrix Devices as technological advances that permitted the provision of the services as represented by Norvergence in its published materials.

b. In reality, there is no technological relationship whatsoever between Norvergence's offer of "free unlimited" telecommunication services and the Matrix Devices.

c. The total amount of the monthly payments as provided in the ERAs over 60 months for Matrix Devices far exceeded their true market value, assuming that they were installed and functional, which in most circumstances they were not.

d. Upon information and belief, the wide range in monthly charges for the Matrix Devices generally corresponds to the difference between the historical cost of telecommunication services to the Plaintiffs as revealed in the telecommunication bills submitted as part of the Norvergence application process, and the flat fee actually charged by Norvergence for the "free unlimited" telecommunication services.

e. Norvergence required that all of its customers enter into the ERA together with the agreement to provide services, and refused to allow any customer to procure and make use of its own Adtran device in connection with the Norvergence Matrix Solution.

f. Norvergence refused to offer to sell the Matrix Boxes.

g. The ERA, which appearing to be an agreement for the rental of certain Matrix

Device(s), is, in reality, nothing more than a mechanism whereby the payments for telecommunication services, which were never expected or intended to be provided, were converted into marketable commercial paper.

h. This transformation of the payment for services into a payment for equipment permitted the conversion of future cash flow into present income.

i. At various times throughout the course of the Enterprise, Norvergence and the Defendant entered into agreements which provided for the sale and/or assignment of the ERAs entered into by and between Norvergence and the customers of Norvergence, including the Plaintiffs to the Defendant.

j. Upon information and belief, the agreement between Norvergence and the Defendant provided for the Defendant's review of applications submitted by prospective customers of Norvergence, including the Plaintiffs'.

k. Upon information and belief, Norvergence and the Defendant participated and cooperated with each other in the review and underwriting of prospective customers' applications, including the Plaintiffs. [In fact, certain of the Defendants went so far as to customize the Norvergence ERA to list that Defendant as Rentor. ]

l. Upon information and belief, the Defendant, in whole or in part, established standards for acceptance of prospective customers' applications, in concert and in cooperation with Norvergence.

m. Upon information and belief, the Defendant eliminated or curtailed its own established credit analysis and underwriting procedures so as to allow them to enter into these cooperative relationships with Norvergence.

n. The Defendant holds itself out as having expertise in the field of telecommunication equipment leasing or equipment leasing in general. Contrary to the standard practice of the trade, however, the Defendant purchased the ERAs and the Matrix Devices they covered without any regard whatsoever for the actual or replacement value of the Matrix Devices which were being purchased.

o. Norvergence and the Defendant worked in close cooperation to maximize profits for themselves at the unfair expense of the Plaintiffs'.

p. As a result of Norvergence's actions taken in concert with the Defendant, many of the ERAs were assigned to and/or purchased by the Defendant and the other finance companies from Norvergence simultaneously, or very nearly thereto, with the acceptance of the ERAs by Norvergence.

q. Pursuant to the various agreements between Norvergence and the Defendant, the Defendant purchased and/or took an assignment of all of Norvergence's right, title, and interest in and to the associated ERAs and the Matrix Devices associated with each such ERA.

r. The Defendant, as consideration for the assignment or purchase of the ERAs were earning approximately 20% per annum on the ERAs, when the prime rate was about 4%, notwithstanding the fact that only the customers with the best credit were eligible to rent the Matrix Devices and to obtain the Norvergence telecommunication services.

s. The provision of payments to Norvergence in this fashion enabled and permitted the Enterprise to continue to carry out its scheme and to further its misrepresentations to additional prospective customers.

144. In furtherance of the affairs of the Enterprise, the Defendant committed a pattern of two or more violations of wire fraud and mail fraud as proscribed by 18 U.S.C.A. 1341 and 1343, including, without limitation, fraudulent activity as defined by 18 U.S.C.A. 1346.

145. Specifically, the Defendant and Norvergence repeatedly sent documents, payment statements and/or invoices among themselves and/or to Plaintiffs by telephone facsimile in interstate commerce and through the mails in furtherance of the Enterprise and of the unlawful scheme, such communications transmitted by wire and/or mail include standard marketing materials, the ERAs, invoices, statements of payment, demands for payment, notices

of assignment, the documentation of the assignment, and the documents memorializing the underlying obligations.

146. Such telephone calls and facsimile transmissions in interstate commerce and use of the mails occurred on a regular and repeated basis between and among Norvergence and the Defendant as well as with Plaintiffs all within the past several years.

147. The Defendant and Norvergence engaged in acts of wire and mail fraud for the purpose of furthering the policy of imposing upon, attempting to collect and/or collecting the monthly payments from Plaintiffs.

148. The Defendant received and continues to receive income derived, directly or indirectly, from the pattern of racketeering activity described above and the Defendant has used or invested, directly or indirectly, a part of the income, or the proceeds of the income, in the acquisition of an interest in, or the operation of the Enterprise, which is engaged in or the activities of which affect trade or commerce, in violation of 18 U.S.C.A. 1962(b).

149. As an intended, necessary and foreseeable consequence of the foregoing transactions and communications Plaintiffs were and continue to be damaged in their business and property by reason of the violation of 18 U.S.C.A. 1962

150. As an example of the damages incurred by Plaintiffs, each of the Plaintiffs has made payments to Norvergence and/or the Defendant.

151. As another example of the damages incurred by Plaintiffs, each is required to pay amounts under the ERA and to pay an alternative telecommunication provider for services which, in essence, amounts to a doubling of costs to Plaintiffs.

152. As described above, the Defendant and Norvergence participated in the

direction, operation, or management of the Enterprise. The Defendant and Norvergence played a vital, directive, important and instrumental role in the Enterprise. The Defendant and Norvergence knowingly implemented decisions of the Enterprise, and its active participation was vital, directive, important and instrumental to the achievement of the Enterprise's primary goal of creating the ERAs and payments required thereunder.

153. The Defendant and Norvergence were employed by or associated with the Enterprise and conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C.A. 1962(c).

154. The Enterprise operates for profit and the Defendant and Norvergence received payments as the result of the scheme and the collection of these monthly payments.

155. In violation of 18 U.S.C.A. 1962(d), Norvergence and the Defendant conspired to conduct or to participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C.A. 1962(a) and (b).

**WHEREFORE,** Plaintiffs respectfully request that the Court:

a. enter judgment in their favor on this Count;

b. award Plaintiffs treble damages as against the Defendant;

c. award to Plaintiffs and against the Defendant attorneys' fees, filing fees and the costs of prosecuting this action; and

d. award to Plaintiffs and against the Defendant the costs of defending any action brought to enforce the ERA, including counsel fees; and

e. award to Plaintiffs and against the Defendant such other equitable relief as deemed appropriate by the Court.

**COUNT VI**

## Unjust Enrichment

156. Plaintiffs incorporate by reference the preceding paragraphs as if same were set forth at length herein.

157. By virtue of the actions and inactions described in the foregoing paragraphs of this Complaint, Defendant has been and would continue to be unjustly enriched in an amount equal to the monthly payments already made and to be made as required by the ERAs because such payments arise from the purported lease of equipment which does not perform the represented function and which the Defendant knew or should have known was fraudulently, knowingly and unjustifiably represented as performing a technological service integral to receiving the services to be provided by Norvergence.

158. Defendants' actions in concert with those of Norvergence in inducing Plaintiffs to contract for and to rent the Matrix Devices, which Defendant knew or should have known were fraudulent, is outrageous and unconscionable conduct.

**WHEREFORE**, Plaintiff respectfully request that the Court:

a. enter judgment in their favor on this Count;

b. award to Plaintiff and against the Defendant damages plus interest from the date the first payments were made by each Plaintiff;

c. award to Plaintiff and against the Defendant the costs of prosecuting this action, including counsel fees;

d. award to Plaintiff and against the Defendant the costs of defending any action brought to enforce the ERA, including counsel fees;

e. award to Plaintiff punitive damages as against the Defendant; and

f. award to Plaintiff and against the Defendant such other equitable relief as deemed appropriate by the Court.

## COUNT VII

**Debts or Obligations Fraudulently Contracted or Incurred Pursuant to N.J.S.A. 2A:32-1**

159. Plaintiffs incorporate by reference the preceding paragraphs as if same were set forth at length herein.

160. Norvergence represented to Plaintiffs that it would provide certain services at substantial savings over the prices charged by other providers of said services.

161. Norvergence further represented to Plaintiffs that in order to obtain the savings so represented, the Plaintiffs were required to rent a Matrix Device, which contained special technology that made such savings possible.

162. Norvergence represented that the Matrix Devices were of special and significant value, when in fact the Matrix Devices were ordinary routers of minimal value.

163. Such fraudulent representations were made by Norvergence in order to induce Plaintiffs to execute the ERAs to rent the Matrix Devices.

164. The Matrix Devices provided by Norvergence as consideration for the execution of such ERAs was fraudulent and inadequate.

**WHEREFORE**, Plaintiffs respectfully request that the Court:

a. enter judgment in their favor on this Count;

b. declare the ERAs rescinded;

c. award to Plaintiff and against the Defendant damages plus interest from the date of the first payment made pursuant to each ERA;

d. award to Plaintiff and against the Defendant the costs of prosecuting this action, including counsel fees;

e. award Plaintiffs and against the Defendant the costs of defending any action brought to enforce the ERA, including counsel fees; and

f. award to Plaintiff and against the Defendant punitive damages; and

g. award to Plaintiff and against the Defendant such other equitable relief as deemed appropriate by the Court.

**Count VIII**
**Disallowance of Claims Pursuant to Bankruptcy Code §502(b)(1)**

165. The Plaintiffs incorporate by reference the preceding paragraphs as if same were set forth at length herein.

166. The Defendant, by virtue of the agreements that it entered into with Norvergence for the purchase and/or assignment of all of Norvergences' rights, title and interest in the ERA's entered into with the Plaintiff Businesses and Plaintiff Guarantors, have contractual right of recourse to Norvergence for damages due to breaches or non-payment of the ERA's by the Plaintiff Businesses ("Recourse Claims").

167. The Defendant's potential rights to payments for Recourse Claims arise out of the unlawful and legally unenforceable ERA's that were the means and instrumentalities of Norvergence's fraudulent scheme in concert and with the assistance of the Defendant.

168. The Defendant's Recourse Claims, if and when asserted, or filed by the Defendant in the Norvergence case, are unsecured claims.

169. The Defendant's Recourse Claims are not entitled to merely the amount of the Discounted Payments but could include claims for amounts representing anticipated profit of the Defendant and costs and expenses incurred by the Defendant.

170. The Defendant's Recourse Claims are objected to by the Plaintiffs as

unenforceable against Norvergence and Norvergence's estate, under applicable law as set forth herein and as a matter of equity that a participant in a fraud may not make claim for damages arising from the fraudulent scheme against another participant.

171. Pursuant to Bankruptcy Code §502(b)(1) the Defendant's Recourse Claim must be disallowed.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter an order disallowing any claim asserted or to be filed by the Defendant arising out of the Defendant's recourse claims for damages regarding the ERAs.

**Count IX**
**Equitable Subordination pursuant to Bankruptcy Code §510(c)**

172. The Plaintiffs incorporate by reference the preceding paragraphs as if same were set forth at length herein.

173. The Defendant's actions and conduct in concert with Norvergence, in aiding and abetting Norvergence's fraudulent scheme and in serving as the means and instrumentality by which Norvergence perpetrated the fraudulent scheme, constituted inequitable conduct by defrauding the Plaintiffs to the detriment of the Plaintiffs and other creditors of Norvergence.

174. The Defendant's actions and conduct as fully described hereinabove was and continues to be unlawful, shocks one's conscience, was and continues to be unfair to the Plaintiffs as creditors of the Norvergence Bankruptcy case and was and continues to be an aiding and abetting of the breach of Norvergence's duties to its creditors.

175. The Defendant's actions and conduct in purchasing or taking assignments of the ERA's and attempting to enforce and collect from the Plaintiffs the monthly payments called for under the ERA even after Norvergence's fraudulent scheme has been openly displayed and

all service and benefits to the Plaintiffs have ceased is an inequitable attempt to shift to the Plaintiffs the "losses" incurred by the Defendant's from their own actions and conduct in concert with and in aid of Norvergence's fraudulent scheme.

176. In addition, at the time of the Defendant's continued inequitable conduct and acts, Norvergence was insolvent and thus owed a fiduciary duty to Norvergence's unsecured creditors, including the Plaintiffs.

177. The Defendant's inequitable and wrongful actions and conduct in threatening and actually suing many of the Plaintiffs to collect and enforce the ERA in continuation of Norvergence's fraudulent scheme was intended to give the Defendant an unfair advantage over other creditors of the Norvergence estate vis-à-vis the Defendant's potential Recourse Claims to claims for damages by the Plaintiffs.

178. The Defendant's potential Recourse Claims would be inequitable and injurious to the other creditors of Norvergence in that such claims originated from Norvergence's fraudulent scheme and are for an amount in excess of the amounts of the Discounted Payments.

179. The Defendant had a close business relationship with Norvergence and aided and abetted Norvergence's fraudulent scheme and was the means and instrumentality of its fraud and as such is subject to special and close scrutiny of its actions and conduct.

180. The Plaintiffs did not have a close relationship with Norvergence, were not sophisticated financing institutions, nor were they aware of the fraudulent scheme being perpetrated upon them by Norvergence with the aid and cooperation of the Defendant.

181. All of the Defendant's inequitable actions and conduct would serve to enrich the Defendant if the Defendant is able to assert Recourse Claims against the Norvergence estate at

the same priority as the Plaintiffs.

182. Further, if the Defendant is permitted to continue to collect and enforce the ERA's against the Plaintiffs, the Defendant will continue to reduce its Recourse Claims while the Plaintiff's unsecured claim will increase.

183. By reason of the foregoing, the Plaintiffs and other unsecured creditors of the Norvergence were harmed by the Defendant's actions and conduct if Defendant's Recourse Claim is allowed at the same priority all general unsecured claims which would be unfair and inequitable.

184. Equitable subordination of the Defendant's claims to the lowest priority of claims below that of unsecured creditors and late filed unsecured claims is consistent with the Bankruptcy Code.

Wherefore, the Plaintiffs respectfully request that this Court enter an order equitably subordinating any claims filed by the Defendants to the lowest priority below all unsecured claims and late filed unsecured claims pursuant to Bankruptcy Code §510(c).

**Count X**

**<u>Claims against Norvergence's Estate pursuant to Bankruptcy Code §§501 & 502</u>**

185. The Plaintiffs incorporate by reference the preceding paragraphs as if same were set forth at length herein.

186. The Plaintiffs names and addresses are set forth on Exhibit A hereto and are incorporated herein.

187. Each respective Plaintiff asserts unsecured claims for the right to payment against the Norvergence estates for damages arising out of the fraudulent scheme perpetrated

upon each of the respective Plaintiff's by Norvergence arising out of the ERA signed by the respective Plaintiff in the amount set forth opposite the respective Plaintiff's name on Exhibit A, which is incorporated herein.

188. The claims for damages herein asserted are based upon damages for fraudulently inducing each Plaintiff to enter into and execute the ERA as well as unliquidated damages for loss of bargain, breach of contract for telecommunications services, tortious conduct by Norvergence, legal fees and costs incurred, all of which are subject to future amendment.

189. The claims asserted herein have not been previously filed and notices to file proof of claims were not sent to the Plaintiffs.

190. The claims were incurred on the date of the execution of the respective ERA by Norvergence and the respective Plaintiff.

191. No judgment has been entered in favor of the respective Plaintiffs for the amount claimed herein.

192. The amount claimed by the respective Plaintiffs has not been discounted to present value but represents the full amount owed by the respective Plaintiff under the respective ERA.

193. A copy of the form of the ERA executed by the Plaintiffs which are the basis of these claims are attached as Exhibit "B."

Wherefore, the Plaintiffs request that this Court enter an order allowing each of their unsecured claims in the amounts set forth opposite their respective names on Exhibit A, subject to future amendment, pursuant to Bankruptcy Code §§501 and 502.

Submitted by:
WEIR & PARTNERS LLP

By: /s/ Sigmund J. Fleck

Sigmund J. Fleck, Esquire (4843)
George R. Tadross, Esquire (0576)
20 Kings Highway West
Haddonfield, NJ 08033-2116
(856) 740-1490 (telephone)
(856) 740-1491 (facsimile)
Attorneys for Plaintiffs

Of counsel:

**ROBERT D. GREENBAUM & ASSOCIATES, LLC**
ROBERT D. GREENBAUM
PA Identification No. 44336
123 South Broad Street, 28th Floor
Avenue of the Arts
Philadelphia, PA 19109
(215) 772-5060(telephone)
(215) 772-5058 (facsimile)

Date: November 22, 2004